2020 IL App (1st) 181888-U

No. 1-18-1888

Order filed March 5, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| BARNEY LONZO, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF CHICAGO; THE HUMAN RESOURCES | ) | |
| BOARD OF THE CITY OF CHICAGO; SALVADOR A. | ) | |
| CICERO, in His Official Capacity as Chairman of the | ) | No. 17 CH 12610 |
| Human Resources Board; SAMUEL L. EVANS, JR., in | ) | |
| His Official Capacity as Member of the Human Resources | ) | |
| Board; KAREN COPPA, in Her Official Capacity as | ) | |
| Member of the Human Resources Board; and DENNIS | ) | |
| MICHAEL FLEMING, in His Official Capacity as Hearing | ) | |
| Officer for the Human Resources Board, | ) | Honorable |
| | ) | Michael T. Mullen, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Appellant lacks standing to assert that the City's corporation counsel did not authorize outside counsel to represent the City before the Human Resources

> Board. Regardless, outside counsel's appearance on behalf of the City created a rebuttable presumption that they were authorized to represent the City and no evidence in the record rebuts that presumption. The Board's findings that the appellant engaged in misconduct were not against the manifest weight of the evidence or clearly erroneous, and its determination that appellant's misconduct constituted cause for his discharge was not arbitrary or unreasonable.

¶ 2     The City of Chicago (City) terminated Barney Lonzo's employment after an investigation revealed that he physically attacked and verbally abused a co-worker. After a hearing, the City's Human Resources Board (Board) upheld the decision. Lonzo sought review in the circuit court by filing a petition for a common law writ of *certiorari*. The circuit court denied the petition, and Lonzo now appeals. He argues that the Board's decision is void because the outside counsel who represented the City did not prove that the City's corporation counsel appointed them to serve as special assistant corporation counsel. He also challenges the substance of the Board's decision, arguing that its factual findings were against the manifest weight of the evidence and that its decision to discharge him was arbitrary and unreasonable. For the reasons that follow, we reject Lonzo's contentions and affirm the Board's decision.[1]

¶ 3                                I. BACKGROUND

¶ 4                          A. The Charges Against Lonzo

¶ 5     Lonzo was employed as a truck driver with the City's Department of Aviation. In January 2014, the City terminated Lonzo's employment based on nine charges that he violated the City's personnel rules. Charges 1–5 alleged violations of Personnel Rule XVIII, section 1, paragraph 15, which prohibits employees from engaging in conduct prohibited by state law. Charge 1 alleged that, on June 17, 2013, Lonzo committed the offense of unlawful restraint by "putting

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[co-worker] Robert Butler in a chokehold, and/or holding the metallic portion of a key tag to [Butler's] throat, and/or throwing [Butler] against the wall, and/or pinning [Butler] down on his back on top of a table." Charge 2 alleged that the same actions constituted the offense of battery, and charge 3 alleged that those actions constituted a hate crime because Lonzo was motivated by Butler's sexual orientation.

¶ 6    Charge 4 alleged that, on June 23, 2013, Lonzo committed another battery by "slapping the bill of [Butler's] hat one or more time[s], and/or pulling at the identification card hanging from [Butler's] neck, and/or lifting [Butler] up by his shirt, and/or shoving [Butler] into a locker, and/or slapping [Butler] in the face one or more times." Charge 5 alleged that those actions were a hate crime because they were motivated by Butler's sexual orientation.

¶ 7    Charge 6 alleged that, on one or more occasions between March 1, 2013 and July 23, 2013, Lonzo violated Personnel Rule XVIII, section 1, paragraph 23, which prohibits "discourteous treatment, including verbal abuse" of another employee, by "calling [Butler] a 'sissy' and/or 'fag' and/or 'faggot' and/or 'bitch' and/or 'pussy' or words to that effect, and/or putting [Butler] in a chokehold, and/or holding the metallic portion of a key tag to [Butler's] throat, and/or slapping the bill of [Butler's] hat one or more times, and/or pulling the identification card hanging from [Butler's] neck, and/or grabbing [Butler] and lifting him up by his shirt, and/or shoving [Butler] into a locker, and/or slapping [Butler] in the face one or more times, and/or threatening to show up at other employees' homes if they reported [his] behavior."

¶ 8    Charge 7 alleged that the same conduct (minus the threat to other employees) violated Personnel Rule XVIII, section 1, paragraph 42, which prohibits discrimination against another employee because of sexual orientation. And charges 8 and 9 alleged, respectively, that the

conduct described in charge 6 violated Personnel Rule XVIII, section 1, paragraph 54, which prohibits acts of violence in the workplace,[2] and Personnel Rule XVIII, section 1, paragraph 50, which prohibits "conduct unbecoming [a] public employee."

¶ 9                                    B. The Administrative Hearing

¶ 10    Lonzo appealed his termination to the Board, which appointed a hearing officer to take evidence and make findings and recommendations related to the charges. The City was represented at the hearing by two attorneys from Greenberg Traurig, LLP ("outside counsel"), who filed an "appearance on behalf of the City of Chicago" identifying themselves as "Special Assistant Corporation Counsel." Lonzo challenged outside counsel's authority to represent the City because the attorneys had not produced documentation "indicating that [they] ha[d] been designated by the corporation counsel." The hearing officer found that the attorneys' appearance established their authority to represent the City.

¶ 11    At the hearing, Butler, Lonzo, and two other co-workers (Chris Trailor and Richard Robinson) testified about the events in question. Butler testified that, on June 17, 2013, he was in the lunchroom with Trailor when Lonzo grabbed him from behind, placed a key chain around his neck, and "choked [him] so hard it lifted [him] out of [his] seat." After Trailor told Lonzo to let Butler go, Lonzo "flipped [Butler] around," "pushed [him] down on [a] table," and "held [him] there for a few minutes," calling him names like "[s]issy," "fag," and "gunt [*sic*] motherfucker." Butler admitted that he called Lonzo an "Uncle Tom" because he was angry at Lonzo for accusing him of stealing from another co-worker. Butler testified that he told his foreman, Char McCue, about the incident but decided not to make a written report.

---

[2] The rule defines violence to include "the threat or use of physical force, including fighting or horseplay."

¶ 12     Butler also described an incident with Lonzo on June 23, 2013. He testified that he was in the garage with other employees, including Robinson, when Lonzo approached him and began hitting the brim of his hat while calling him a "stupid sissy." Butler testified that, when he told Lonzo to stop, Lonzo slapped him across the face. Trailor arrived at the garage and drove Butler to the office of their supervisor, Dwayne Hayden, who summoned Lonzo to his office and directed him to apologize to Butler. Butler testified that he did not grab Lonzo's genitals or otherwise touch him inappropriately.

¶ 13     Trailor testified that he and Butler were longtime friends who socialized outside of work and occasionally vacationed together. He testified that he was in the lunchroom with Butler on June 17, 2013, and believed that Robinson, Paul West, and Kenny Collier were there as well. He testified that Butler was sitting at a table when Lonzo came in. Lonzo and Butler began "talking back and forth and started playing—calling each other names and things like that." Lonzo called Butler a "fag" and a "sissy," and Butler called Lonzo an "Uncle Tom." Trailor testified that Butler did not get offended when other employees referred to him with homophobic slurs, but that he did not use such words to refer to himself. As the argument escalated, Lonzo walked behind Butler and grabbed him by the neck. Lonzo held his key chain up to Butler's neck and "forcefully picked him up off the seat." Trailor testified that Butler looked to be in pain and was unable to speak because Lonzo's arm was around his neck. Trailor told Lonzo to stop, but Lonzo ignored him. When Trailor repeated his command more forcefully, Lonzo finally let Butler go. He pushed Butler forward and told Trailor: "I'm glad you said something because I was going to choke him." Trailor testified that he did not see Butler rub up against Lonzo or physically do anything else to instigate the attack.

¶ 14    Trailor also described his role in the aftermath of the June 23 altercation. He testified that he was not in the garage when the incident occurred, but that he arrived after receiving a text message from Robinson. After Butler told him what had happened, he took Butler to McCue's office and then to Hayden's office. Trailor later brought Lonzo to Hayden's office, where Lonzo apologized and said that he had only been horsing around.

¶ 15    Robinson testified that he was in the garage with Butler and several other employees on June 23, 2013, when Lonzo arrived and "start[ed] playing with Butler" by "grabbing his name tag and stuff like that." Robinson testified that Lonzo and Butler would "kid around a lot" and frequently engage in "[h]orseplay." That day, however, Butler did not appear willing to play along. Robinson testified that Butler had a serious look on his face and told Lonzo to "[t]ake your hands off me," which caused Lonzo to "start[ ] getting real aggressive." Robinson testified that Lonzo pulled Butler's lanyard, knocked the hat off Butler's head, and "started roughing him up." At that point, Butler again told Lonzo to take his hands off him, and said: "It's n*****s like you that got Emmett Till killed." After briefly leaving the area, Lonzo returned and "cut [Butler] off" as Butler was on his way to tell the foreman what had happened. Lonzo grabbed Butler, pushed him against a locker, and started "roughing him up again." He then slapped Butler across the face three times and "called him a pussy, a fag[,] and a bitch." Robinson testified that he saw a scratch on Butler's face after Lonzo slapped him, and that he did not see Butler grab Lonzo's genitals or do anything else to instigate the attack. Robinson testified that Lonzo later asked him if he was "going to be on the side of the sissy" and "tell on me." When Robinson told Lonzo that "you don't put your hands on nobody," Lonzo responded that "it got out of hand." Robinson also

heard Lonzo tell several other employees: "If anybody say anything, I'm going to be at their doorstep."

¶ 16    Lonzo testified that he had worked for the City in various capacities since 1987. He testified that he was "laid off" from a position with the Department of Streets and Sanitation in August 2005 but was rehired by the Department of Aviation a year later. He denied that the 2005 termination resulted from misconduct. After stints with the Department of Transportation and the Department of Water Management, he returned to the Department of Aviation in December 2012, where he worked until his termination in January 2014. Lonzo denied that the June 17, 2013 lunchroom altercation described by Butler and Trailor took place, but he admitted to having pushed Butler earlier that day because Butler "was climbing up *** on [him]." As for the June 23, 2013 incident in the garage, he admitted that he slapped the bill of Butler's hat and called Butler a "sissy," but he denied shoving Butler, slapping his face, or calling him a "faggot." Lonzo testified that he slapped Butler's hat because Butler touched his crotch, called him an "Uncle Tom," and told him that "individuals like [him] got Emmett Till murdered."

¶ 17    The City presented evidence of several prior incidents of workplace misconduct by Lonzo. Jose Benavides, a trash collector with the Department of Streets and Sanitation, described an incident in August 2005 when Lonzo, his truck driver, got into an argument with a resident and chased after the resident at an unsafe speed as Benavides clung to the truck from the back platform. Jeffrey Koestner, a laborer with the Department of Transportation, testified that he was involved in two altercations with Lonzo in May 2012. The first incident occurred when Koestner asked Lonzo to move his truck so laborers could fill a pothole. Lonzo angrily refused and began "yelling, ranting[,] and raving." Later that day, Koestner told Lonzo that he was going to send a

co-worker named Gus, whom he knew Lonzo did not like, to work with Lonzo's crew. Koestner played no role in crew assignments, and he conceded that he was trying to upset Lonzo by mentioning Gus. Lonzo did get upset and said that, if Koestner sent Gus, he would "kick [Koestner's] ass and Gus's ass." Lonzo also said that, if Koestner told anyone what he had said, he would "send his friends over to slit [Koestner's] throat." Finally, Pharlandria Davis, a Department of Transportation truck driver, testified that Lonzo punched her in the shoulder in August 2012 while arguing with a fellow employee.

¶ 18    Robert May, the Director of Administration for the Department of Aviation, testified that Lonzo received a four-day suspension for the incidents involving Koestner. May recommended to his supervisors that Lonzo be terminated for his violence against Butler. He explained that the City adheres to a policy of progressive discipline for "non-egregious" misconduct, but that "chok[ing] an employee" was an "egregious" offense that "warrant[ed] termination." May was concerned that other employees would fear for their safety if Lonzo returned to work, but he conceded that he had not spoken to any employees about the matter. May also testified that Lonzo's prior suspension "played a small part" in his recommendation.

¶ 19    Christopher Owen, the First Deputy Commissioner of the City's Department of Human Resources, testified that Lonzo was terminated in 2005 for disciplinary reasons and was rehired in 2006 because the City failed to flag his ineligibility. Owen also testified that allowing Lonzo to return to work following his altercations with Butler would have a "very negative effect" because his violent conduct made other employees afraid. He explained that reinstating Lonzo despite his "egregious" conduct would "send [the] wrong message" to other employees. Although Owen testified that he was familiar with the circumstances surrounding Lonzo's 2014

termination, he stated on cross-examination that his current recollection was that Lonzo had threatened to kill a co-worker and held a knife or other sharp object to his throat. He also conceded that he was not familiar with the nature of the workplace for truck drivers at the Department of Aviation.

¶ 20    Finally, Lonzo presented testimony from four other co-workers. Ida Mae Jones testified that she had heard Butler refer to himself using slurs like "sissy," "fag," "faggot," "bitch," and "pussy," and that Butler did not appear offended when others referred to him with those terms. She testified that she never heard Lonzo use such terms toward Butler, nor had she seen Lonzo strike or bully Butler. She also testified that she never saw an employee choke or slap another employee at work. She conceded, however, that she did not witness the events of June 17, 2013 or June 23, 2013.

¶ 21    Frank Perrone testified that he heard Butler call himself a "sissy," a "fag," and a "faggot," and that he heard other employees call Butler a "sissy," which offended Butler. He testified that he never saw Lonzo hit Butler and that (if he still worked for the City) he would not be afraid if Lonzo were reinstated. James Rufus testified that he never witnessed a physical altercation between Lonzo and Butler. He heard numerous people refer to Butler using homophobic slurs but was not aware of anyone ever being disciplined for doing so. Rufus testified that he too would not be scared if Lonzo returned to work. Paul West likewise testified that he would not be scared if Lonzo were reinstated. He also testified that he was not at work on June 17, 2013, or June 23, 2013.

¶ 22                          C. The Hearing Officer's Report

¶ 23    Following the hearing, the hearing officer issued a report to the Board recommending that Lonzo's termination be upheld. The hearing officer found that neither Lonzo nor Butler were credible witnesses, but that the "testimony from the co-workers who knew both [men] was credible" and that their "testimony proved *** the acts of battery alleged in [charges 1 (unlawful restraint), 2 (battery), and 4 (battery)] and the portions of charges 6 [discourteous treatment], 8 [violence in the workplace], and 9 [conduct unbecoming a public employee] relating to the physical altercations" of June 17, 2013 and June 23, 2013. In addition, with respect to charges 6 and 9, the hearing officer found that Lonzo's use of "gay slurs" toward Butler was "proven by a preponderance of the evidence," and that both "the use of such language" and "the physical force alleged and proved" was "discourteous treatment and conduct unbecoming a public employee." In light of the testimony that it was "not uncommon for [Butler] to refer to himself with anti-gay slurs" or for "other employees to refer to [Butler] in similar terms," the hearing found that the City failed to prove that Lonzo's actions "were motivated by [Butler's] actual or perceived sexual orientation[ ]," as alleged in charges 3 and 5.[3]

¶ 24    The hearing officer acknowledged the City's policy of progressive discipline, but determined that Lonzo's "physical acts of violence" against Butler "were so egregious that *** progressive discipline would not be appropriate." The hearing officer concluded that Lonzo's termination was further warranted in light of his "pattern and practice of violent

_____

[3] The hearing officer's report states that the City proved charge 7 (discrimination based on sexual orientation), but the report does not discuss the basis for that finding, which appears inconsistent with the hearing officer's conclusion that Lonzo was not motivated by Butler's sexual orientation. Because the Board did not adopt the hearing officer's finding with respect to charge 7, we need not resolve the apparent inconsistency.

reactions and threats against co-workers," which made his conduct toward Butler "more threatening to employees of the Department of Aviation."

¶ 25                                    D. The Board's Decision

¶ 26    The Board largely adopted the hearing officer's findings (except with respect to charge 7) and upheld Lonzo's termination. Like the hearing officer, the Board found that neither Lonzo nor Butler were credible witnesses, but that "the testimony of the co-workers, who knew both men, was credible in their description of [Lonzo's actions] on June 17, 2013, and June 23, 2013." The Board found that "the testimony of the co-worker[s] was sufficient to prove by a preponderance of the evidence that [Lonzo] violated the Personnel Rules as alleged in [charges 1, 2, and 4] and the portions of [charges 6, 8, and 9] relating to the acts of battery." The Board further found that the City "prove[d] by a preponderance of the evidence that the physical altercations between [Butler] and [Lonzo] and [Lonzo's] use of gay slurs against [Butler] was discourteous treatment and conduct unbecoming a public employee," as alleged in charges 6 and 9. Based on the testimony that it was "not uncommon" for both Butler and other employees to refer to Butler with homophobic slurs, the Board found the evidence insufficient to prove that Lonzo's actions were motivated by Butler's sexual orientation, as alleged in charges 3, 5, and 7.

¶ 27    Like the hearing officer, the Board recognized the City's policy of applying progressive discipline where appropriate, but it noted that progressive discipline was not required "in cases of egregious conduct." The Board concluded that "[t]he charges proven by the city in this case are so egregious that progressive discipline was not appropriate" and termination was warranted, regardless of the testimony of several co-workers that they did not feel threatened by Lonzo. In

any event, the Board stressed that if progressive discipline were warranted, Lonzo's previous discipline for similar conduct "comport[ed] with" that policy.

¶ 28                              E. The Circuit Court's Decision

¶ 29    Lonzo filed a petition for a common law writ of *certiorari* in the circuit court, challenging the Board's decision. He argued that the proceedings before the Board were "a nullity" because the outside counsel who represented the City had not established that the corporation counsel authorized them to serve as special assistant corporation counsel. Lonzo also argued that the Board's factual findings were against the manifest weight of the evidence and that its decision to uphold his termination was arbitrary and unreasonable.

¶ 30    The circuit court denied the petition. The court held that the appearance filed by outside counsel "clearly evidenced" that the attorneys were authorized to represent the City before the Board. The court further concluded that there was "sufficient evidence [in] the record to support not only the [Board's] findings of fact *** but also [its] ultimate decision" to terminate Lonzo's employment. Lonzo filed a timely notice of appeal.

¶ 31                                     II. ANALYSIS

¶ 32                                 A. Standard of Review

¶ 33    Final decisions of the City's Human Resources Board "are reviewable through a common law writ of *certiorari*," *Sroga v. Personnel Board of the City of Chicago*, 359 Ill. App. 3d 107, 110 (2005), which is the vehicle for obtaining judicial review of "administrative actions when the act conferring power on the agency does not expressly adopt the Administrative Review Law and provides for no other form of review," *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). "The standards of review under a common law writ of *certiorari* are essentially the same as those

under the Administrative Review Law." *Id.* Under either standard, our task is to review the agency's decision, rather than the decision of the circuit court. *Johnson v. O'Connor*, 2018 IL App (1st) 171930, ¶ 13.

¶ 34    We defer to the agency's factual findings unless they are against the manifest weight of the evidence, which is the case only "if the opposite conclusion is clearly evident" from the record. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. We review questions of law *de novo*. *Id.* And we review mixed questions of law and fact—those that apply a legal principle to a given set of facts—for clear error. *Id.* We will find clear error in an agency's resolution of a mixed question of law and fact only when we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.*

¶ 35    When reviewing an agency's decision to terminate an employee for misconduct, we first assess whether the agency's findings of misconduct are against the manifest weight of the evidence. *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983). We then consider whether the findings "provide a sufficient basis for the agency's conclusion that cause for discharge *** exist[s]." (Internal quotation marks omitted.) *Id.* Cause is defined as "some substantial shortcoming which renders the employee's continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his" discharge. (Internal quotations marks and brackets omitted.) *Id.* We will reverse an agency's determination regarding cause for discharge "only if it is arbitrary and unreasonable or unrelated to the requirements of the service." *Id.*

¶ 36                B. Outside Counsel's Authority to Represent the City

¶ 37    At the outset, Lonzo contends that the Board's decision is void because the record does not establish that outside counsel were authorized to represent the City. By law, the City's corporation counsel "shall appear for and protect the rights and interests of the city in all actions, suits, and proceedings brought by or against it or any city officer, board or department." 65 ILCS 20/21-11 (West 2018). Lonzo does not dispute that the corporation counsel may delegate his authority to represent the City to assistant corporation counsel or to outside counsel whom he appoints as special assistant corporation counsel. See Chicago Municipal Code § 2-60-020(a) ("The corporation counsel shall *** [s]uperintend and, with his assistants and clerks, conduct all the law business of the city."); *cf. Saxby v. Sonnemann*, 318 Ill. 600, 607 (1925) ("It is, of course, easily seen that in a great state such as this the multiplicity of duties of the Attorney General forbid personal attention to all of them. He must, and does, have power to appoint the necessary deputies or assistants to aid in carrying out those duties."). Instead, Lonzo argues that the outside counsel who appeared in this case did not sufficiently prove that the corporation counsel authorized them to represent the City.

¶ 38    Lonzo lacks standing to challenge outside counsel's authority to represent the City. "A party does not have standing to challenge opposing counsel's ability to represent a client without some showing that the representation adversely affects interests of the party challenging opposing counsel's representation." *In re Estate of M.L.*, 2018 IL App (3d) 170712, ¶ 27. Lonzo does not assert that outside counsel's representation of the City adversely affected his own interests. Rather, he suggests that the representation may have adversely affected the City's interests. In particular, Lonzo theorizes that the City may not have supported the Department of

Aviation's decision to fire him, and that the Department may have unilaterally retained outside counsel to advance its own interests as opposed to those of the City.[4] But any argument that outside counsel was not authorized to represent the City is for the City, not Lonzo, to make. See, *e.g.*, *Ferguson v. Patton*, 2013 IL 112488, ¶¶ 18, 29-32 (challenge by corporation counsel to authority of City's inspector general to independently retain outside counsel). Lonzo notes that a party may challenge a non-attorney's ability to represent an opposing party, even in the absence of harm to the challenging party, but that exception to the general rule that a party lacks standing to vindicate the rights of others rests on the overriding need to "protect[ ] both the public and the integrity of the court system" from the unauthorized practice of law. *Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040, ¶ 30. The possibility that a licensed attorney was not retained by the client she purports to represent does not implicate the same systemic concerns.

¶ 39    Even if Lonzo had standing, the record establishes that outside counsel were authorized to represent the City. Outside counsel filed an appearance on behalf of the City identifying themselves as special assistant corporation counsel. "When an attorney appears of record for a party, there is a rebuttable presumption that the party authorized the attorney to do so." *Stone Street Partners, LLC v. City of Chicago Department of Administrative Hearings*, 2014 IL App

---

[4] We note that the scenario Lonzo posits is exceedingly unlikely to have occurred. For one thing, the City's Law Department (headed by the corporation counsel) was required to review the statement of charges against Lonzo before the Department of Aviation informed him of his termination. See Chicago Municipal Code § 2-74-050(12) ("No permanent employee in the career service may be discharged, demoted or suspended for more than 30 days unless the statement of charges and any matters in support are first reviewed by the departments of law and human resources, before the employee is notified of such action."). For another, the record demonstrates that a member of the Law Department (a deputy corporation counsel) was served with various pre-hearing pleadings and was present at the hearing.

(1st) 123654, ¶ 21. The presumption may be overcome "when the facts show a lack of authorization," *Gray v. First National Bank of Chicago*, 388 Ill. 124, 129 (1944), but Lonzo does not identify any evidence that outside counsel lacked authority to represent the City. Instead, Lonzo asserts that outside counsel were required to produce documentation from the corporation counsel establishing their appointment. But "[a]ttorneys who file lawsuits or appear for parties in litigation have no burden to tender their oaths of office on request or to provide written proof to an opposing party that they actually were hired by their clients." *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 60. In the absence of facts showing a lack of authorization, outside counsel's appearance sufficed to establish their authority to represent the City.

¶ 40     In arguing to the contrary, Lonzo relies primarily on *Ferguson*, which held that the City's inspector general could not unilaterally retain outside counsel to prosecute an action in his official capacity because the corporation counsel had exclusive authority to represent the City in litigation. 2013 IL 112488, ¶¶ 32-33 (citing 65 ILCS 20/21-11 (West 2010)). But *Ferguson* does not restrict the *corporation counsel's* power to retain outside counsel. Nor does it require outside counsel to produce evidence of their appointment above and beyond the filing of an appearance on the City's behalf.

¶ 41                          C. The Board's Findings of Misconduct

¶ 42     Turning to the merits, Lonzo argues that the Board's factual findings are against the manifest weight of the evidence. Initially, Lonzo contends that the Board's findings that he engaged in misconduct on June 17, 2013, and June 23, 2013, cannot be sustained because (in his view) the Board relied solely on the testimony of a single, unspecified co-worker. As Lonzo notes, Trailor testified that he witnessed only the June 17 altercation and Robinson testified that

he witnessed only the June 23 altercation. However, there is no merit to Lonzo's contention that the Board relied on the testimony of only one of these witnesses. The Board wrote that "neither [Butler] nor [Lonzo] were credible witnesses," but that "the testimony of the *co-workers*, who knew both men, was credible in their description of [Lonzo's actions] on June 17, 2013, and June 23, 2013." (Emphasis added.) In the next sentence, the Board wrote that "the testimony of the *co-worker* was sufficient to prove" the charges. (Emphasis added.) In context, it is clear that the reference to the "co-worker" in the second sentence was merely a typographical error, and that the Board in fact relied on the testimony of both co-workers—Trailor and Robinson.

¶ 43     The hearing officer's report is even clearer on this point and dispels any lingering doubt. The hearing officer wrote that: "There was a clear dispute over what occurred on June 17, 2013, and June 23, 2013, if one compares the testimony of [Lonzo] and [Butler]. Neither of the witnesses is credible. The testimony from the *co-workers* who knew both [Lonzo] and [Butler] was credible and *that testimony* proved the charges against [Lonzo]." (Emphasis added.) Because the Board found "no reason to challenge the Hearing Officer's determination of [the] credibility of the witnesses," there is no basis on which to conclude that the Board silently departed from the hearing officer's reliance on the testimony of both co-workers and instead chose to rely on the testimony of just one of the co-workers without specifying which one.

¶ 44     Lonzo next argues that the record does not support the Board's findings that he engaged in conduct constituting unlawful restraint and battery. The Board relied on Trailor's testimony in finding that Lonzo committed acts of unlawful restraint and battery on June 17, 2013. Lonzo

argues that Trailor's credibility is "suspect" because he is close friends with Butler.[5] And he contends that Trailor's credibility was "further lessened" because Trailor failed to make a written report of the June 17 incident and testified that he "believe[d]" that Paul West, Richard Robinson, and Kenny Collier were present for the incident even though West testified that he was not at work that day. (Robinson was not asked about the June 17 incident and Collier did not testify at all.) But the Board found Trailor's testimony credible, and it is not our function to reassess that determination. See *Gernaga v. City of Chicago*, 2015 IL App (1st) 130272, ¶ 13 ("Determinations as to the weight of evidence and the credibility of witnesses are matters within the province of the agency."). "If the issue before the reviewing court is merely one of conflicting testimony and credibility of witnesses, the administrative board's decision should be sustained." *O'Boyle v. Personnel Board of the City of Chicago*, 119 Ill. App. 3d 648, 653 (1983). Having reviewed the record, we cannot say that the Board's decision to credit Trailor's testimony was against the manifest weight of the evidence.

¶ 45   Lonzo also contends that Trailor's testimony does not establish that he committed unlawful restraint. "A person commits the offense of unlawful restraint when he or she knowingly without legal authority detains another." 720 ILCS 5/10-3(a) (West 2018). "The gist of unlawful restraint is the detention of a person by some conduct which prevents him from moving from one place to another." *People v. Black*, 2012 IL App (1st) 101817, ¶ 21. "[T]he duration of the restraint, however short, is inconsequential." *People v. Sparks*, 314 Ill. App. 3d

---

[5] Lonzo also attacks Trailor's credibility by citing testimony that Trailor and Butler accused Lonzo for financial gain. But the hearing officer excluded this testimony, and Lonzo forfeited any challenge to that evidentiary ruling by failing to argue such a claim in his opening brief. *Vancura v. Katris*, 238 Ill. 2d 352, 369 (2010) ("failure to argue a point in the appellant's opening brief results in forfeiture of the issue") (citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)). We thus do not consider this testimony in our review of the Board's factual findings.

268, 274 (2000). Trailor testified that Lonzo held his key chain to Butler's neck and "forcefully picked [Butler] up off the seat." Trailor further testified that Lonzo released Butler only after Trailor made repeated pleas for him to do so. This testimony was sufficient to establish that Lonzo knowingly without legal authority detained Butler "by some conduct which prevent[ed] him from moving from one place to another." *Black*, 2012 IL App (1st) 101817, ¶ 21.

¶ 46    Lonzo argues that the events described by Trailor cannot constitute the offense of unlawful restraint because his detention of Butler was only incidental to his related acts of battery against Butler. In support of this argument, Lonzo relies on *People v. Daniel*, 2014 IL App (1st) 121171, and *People v. Kuykendall*, 108 Ill. App. 3d 78 (1982), but neither decision is applicable here. In *Daniel*, the court vacated a defendant's aggravated unlawful restraint conviction under the one-act, one-crime rule because it relied on "the same physical act as [the defendant's] armed robbery conviction." 2014 IL App (1st) 121171, ¶ 54. "The one-act, one-crime rule prohibits convictions for multiple offenses that are based on precisely the same physical act." *People v. Smith*, 2019 IL 123901, ¶ 13. But the rule does not apply in administrative proceedings, which are civil in nature. See *Smoke N Stuff v. City of Chicago*, 2015 IL App (1st) 140936, ¶ 19 (holding that one-act, one-crime rule "has no application" in administrative proceedings involving "civil municipal ordinance violation[s]").

¶ 47    The rule expressed in *Kuykendall* is likewise inapplicable. There, the Fourth District reversed a defendant's unlawful restraint conviction because the defendant's "apparent intent" was "to commit [an uncharged] battery" and "the restraint was only incidental to the battery." 108 Ill. App. 3d at 710-11. The Second District has questioned the soundness of *Kuykendall*'s holding, explaining that a defendant's motive "is simply irrelevant" under the unlawful restraint

- 19 -

statute, which requires only that the defendant knowingly detain another person without legal authority. *People v. Lissade*, 403 Ill. App. 3d 609, 613-15 (2010). Even assuming *Kuykendall* was correctly decided, its holding would not apply to administrative proceedings, where the City is not required to present evidence sufficient to sustain a criminal conviction. See *Lyles v. Department of Transportation*, 183 Ill. App. 3d 901, 909 (1989) ("[T]he proper standard of proof applicable to discipline and discharge proceedings, including those where conduct that might constitute a crime is charged, is the preponderance of the evidence standard."). To establish a violation of its personnel rules, the City needed only to demonstrate by a preponderance of the evidence that Lonzo "[e]ngag[ed] in any act or conduct prohibited by" state law. City of Chicago Personnel Rule XVIII, Section 1, Paragraph 15. We cannot say that the Board clearly erred in concluding that Lonzo engaged in conduct prohibited by the unlawful restraint statute—which prohibits a person from "knowingly without legal authority detain[ing] another," 720 ILCS 5/10-3(a) (West 2018)—when he held his key chain to Butler's neck and "forcefully picked [Butler] up off the seat."

¶ 48    Lonzo next argues that the record does not establish that he committed acts of battery. "A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2018). "Bodily harm consists of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent," and may be proved by "circumstantial evidence in light of common experience." (Internal quotation marks omitted.) *People v. Bishop*, 218 Ill. 2d 232, 250 (2006). Likewise, "a particular physical contact may be deemed insulting or provoking based upon the factual context

in which it occurs," *People v. d'Avis*, 250 Ill. App. 3d 649, 651 (1993), and "the victim's reaction at the time," *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55.

¶ 49    The record was more than sufficient to establish that Lonzo committed battery on June 17 by "caus[ing] bodily harm" to Butler. 720 ILCS 5/12-3(a)(1) (West 2018). Trailor testified that, during the incident in the lunchroom, when Lonzo grabbed Butler by the neck and "forcefully picked him up," Butler was unable to speak and appeared to be in pain. Lonzo contends that Trailor was not competent to state whether Butler experienced pain, but the Board could reasonably infer from Trailor's description of Butler's reaction and from common sense that Butler experienced physical pain from Lonzo's actions. See *People v. Rotuno*, 156 Ill. App. 3d 989, 992-93 (1987) (evidence that defendant kicked victim's legs and mid-section "was sufficient to prove circumstantially that [the victim] suffered some physical pain").

¶ 50    The record also amply supports a finding that Lonzo committed battery on June 23 both by "caus[ing] [Butler] bodily harm," 720 ILCS 5/12-3(a)(1) (West 2018), and by "mak[ing] physical contact of an insulting or provoking nature with [him]," 720 ILCS 5/12-3(a)(2) (West 2018). Robinson testified that, during the incident in the garage, Lonzo pulled Butler's lanyard, knocked the hat off Butler's head, and "started roughing [Butler] up." According to Robinson, even after Butler told Lonzo to stop, Lonzo pushed Butler against a locker and slapped him across the face three times. Robinson testified that he saw a scratch on Butler's face after Lonzo slapped him. That testimony alone was sufficient to establish that Lonzo caused Butler bodily harm. See *People v. Durham*, 312 Ill. App. 3d 413, 418-19 (2000) ("nicks and cuts are similar in nature to lacerations, abrasions, and bruises" and are sufficient to establish "bodily harm" under the battery statute). In addition, a rational factfinder could easily conclude that Lonzo's physical

contact with Butler was of an insulting or provoking nature. Although Lonzo characterizes his actions as "typical horseplay," the Board was entitled to conclude that shoving Butler against a locker and slapping his face went far beyond mere horseplay.

¶ 51    Lonzo also contends that the evidence was insufficient to support the Board's findings that he engaged in discourteous conduct, violence in the workplace, and conduct unbecoming a public employee. The Board concluded that Lonzo's physical attacks on Butler constituted workplace violence, and that both his physical attacks and his use of homophobic slurs constituted discourteous treatment and conduct unbecoming a public employee. Lonzo argues that his conduct was no worse than other types of horseplay and "loutish behavior" that were common at the workplace. Even if Lonzo's conduct amounted to horseplay, however, it would not undermine the Board's conclusion that he engaged in violence in the workplace, as the City's personnel rules include "horseplay" within the definition of violence.

¶ 52    Moreover, it was reasonable for the Board to conclude that Lonzo's conduct went beyond mere horseplay and was not common workplace behavior. Although the Board found that it was common for employees (including Butler) to refer to Butler with homophobic slurs, the evidence established that Lonzo's physical violence toward Butler was extreme and uncommon. Trailor testified that Lonzo forcefully lifted Butler by his neck, causing Butler pain and inhibiting his ability to speak. And Robinson testified that Lonzo pushed Butler against a locker, "rough[ed] him up," and slapped him across the face. While Robinson acknowledged that Lonzo and Butler would often engage in horseplay and "kid around" with each other, his testimony made clear that the conduct he witnessed crossed the line. Indeed, when Robinson told Lonzo after the incident in the garage that "you don't put your hands on nobody," Lonzo conceded that things "got out of

hand." And co-worker Ida Mae Jones testified that employees did not choke or slap each other at work. Thus, even if Lonzo's use of homophobic slurs alone did not constitute discourteous treatment or conduct unbecoming a public employee in light of the apparent prevalence of such language at the workplace (a question we need not resolve), his use of such language coupled with physical acts of violence plainly did constitute discourteous treatment and conduct unbecoming a public employee.

¶ 53                    D. The Board's Determination of Cause for Discharge

¶ 54    Finally, Lonzo challenges the Board's determination that there was cause for his discharge. Citing *Cruz v. Dart*, 2019 IL App (1st) 170915, he asks us to quash the Board's decision or remand for further consideration because the Board (in his view) failed to make adequate findings in support of its decision. In *Cruz*, after finding that a sheriff's officer had engaged in misconduct, the agency simply "granted" the sheriff's "request to terminate" the officer "without comment or explanation." *Id.* ¶ 60. Because the agency's decision "contained no findings that specifically support[ed] 'cause' for [the officer's] termination," we remanded so the agency could "give full consideration as to the appropriate sanction." *Id.* Unlike in *Cruz*, the Board here did not simply uphold the City's decision to discharge Lonzo without comment or explanation. Rather, the Board expressly found that Lonzo's conduct warranted termination due to its "egregious" nature. The Board further explained that, even if progressive discipline were required, Lonzo's termination was consistent with that policy because Lonzo had previously been disciplined for similar misconduct. These findings "specifically support[ed] 'cause' for [Lonzo's] termination." *Id.* No further findings were required.

¶ 55    Lonzo also contends that the Board's decision to uphold his discharge was arbitrary and unreasonable. Although he concedes that the conduct described by Butler was egregious, he notes that the Board found Butler incredible. But he ignores that the Board credited the testimony of Trailor and Robinson, which largely corroborated Butler's description of events and provided ample support for the Board's findings of misconduct. As we discussed above, we defer to the Board's credibility determinations and factual findings because they are not against the manifest weight of the evidence.

¶ 56    Lonzo argues that the Board's decision was flawed because it relied on Owen's testimony that allowing him to return to work would send the wrong message to other employees and cause them to fear for their safety. As he notes, Owen was unable to recall the specific details of Lonzo's misconduct and conceded that he was unfamiliar with the nature of the workplace for truck drivers at the Department of Aviation. But the Board also relied on testimony from May, the Department's Director of Administration, who opined that "chok[ing] an employee" was an egregious offense that warranted termination and likewise expressed concern that reinstating Lonzo would make other employees afraid for their safety. Moreover, even without testimony from Owen or May, the Board could reasonably conclude that Lonzo's multiple acts of violence against Butler amounted to egregious conduct that constituted cause for his discharge.

¶ 57    Lonzo also notes that several employees testified that they would not fear for their safety if he returned to work. But none of those employees witnessed Lonzo's attacks on Butler. The Board concluded that Lonzo's conduct warranted termination despite the co-workers' testimony that he "was not a threat to them." Because the Board is better positioned "to determine the effect of an employee's conduct on the department," *Marzano v. Cook County Sheriff's Merit Board*,

396 Ill. App. 3d 442, 446 (2009), we will not second guess its determination that allowing Lonzo to return to work would have deleterious effects on the workplace.

¶ 58    In sum, the Board's findings that Lonzo committed several acts of misconduct were not against the manifest weight of the evidence or clearly erroneous, and its determination that Lonzo's misconduct constituted cause for his discharge was not "arbitrary and unreasonable or unrelated to the requirements of the service." *Walsh*, 96 Ill. 2d at 105.

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the circuit court's judgment denying Lonzo's petition for a common law writ of *certiorari* and uphold the Board's decision terminating his employment.

¶ 61    Affirmed.